IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JOSEPH GIDEON HANCOCK,

    Petitioner,

vs.

ANTHONY P. KANE,

    Respondent.

No. CIV-S-02-2413 FCD KJM P

<u>ORDER AND</u>

<u>FINDINGS AND RECOMMENDATIONS</u>

        Petitioner is a state prisoner proceeding pro se with an application for writ of habeas corpus under 28 U.S.C. § 2254. In 1999, petitioner was convicted in the Superior Court of Sacramento County of second degree murder and assault with a firearm. Petitioner was sentenced to the California Department of Corrections to an indeterminate sentence of fifteen-years-to-life imprisonment, in addition to a determinate and consecutive twenty-four year prison sentence. Petitioner challenges his convictions.

/////
/////
/////
/////
/////

I. <u>Background</u>

Petitioner appealed his convictions and sentences to the California Court of Appeal. The Court of Appeal summarized the facts underlying petitioner's convictions and sentences as follows:

> Defendant resided at 7709 Renton Way with his parents, brothers and sister. Around 10:00 p.m. on June 30, 1997, defendant received two telephone calls from an acquaintance, Shawn Warford. Defendant and Warford argued, and at one point Warford said, "Do you want to see me?" At another point, defendant said, "[F]uck you. Come on nigger. Come on then. Come over here."
>
> After the phone calls, defendant was "upset," "agitated" and "furious." He told his sister to go in the back and to stay down. Defendant's girlfriend, Brooke B., followed defendant outside. Twenty seconds later, they went back inside and upstairs, where defendant obtained his father's loaded, .380-caliber handgun. Defendant went back outside.
>
> Warford and a friend, Christopher Giles, drove to defendant's house. Warford got out of the car and began walking toward the house. He was unarmed. Warford met defendant near the sidewalk. They were standing two or three feet apart and defendant was holding the handgun. Five or 10 seconds later, defendant raised the gun and shot Warford in the neck. Warford fell, then got back up and began running. He stumbled across the lawn in the direction of the intersection of Renton Way and Palmer House. Warford eventually fell on the sidewalk 15 yards from the intersection.
>
> After the shooting, defendant came down the driveway waiving [sic] the gun at Giles, who had gotten out of the car. Defendant told Giles to get out of there before defendant blasted him too.
>
> After the shot, defendant's mother called 911. Defendant came into her room and spoke with the dispatcher. Defendant and Brooke then went into defendant's brother's bedroom and the two got into bed. When defendant's brother came into the room, defendant told his brother to turn out the lights and pretend that nobody at the house knew what happened. Defendant's brother lay on the floor and pretended to sleep.
>
> The police knocked at the front door of the house. They were directed to defendant's brother's bedroom where they knocked and received no answer. The officers kicked in the door and arrested defendant.

|   |   |
|---|---|
| 1 | Warford died as a result of the gunshot wound. |
| 2 | *The Defense* |
| 3-4 | Defendant presented testimony from several witnesses that Warford had a reputation for violence and carrying firearms. Defendant himself had seen Warford use guns in prior incidents. |
| 5-9 | Defendant testified he received a telephone call from Giles at approximately 9:30 p.m. asking defendant to look at a car engine. Defendant said he was too busy and he would call Giles later. Warford called 10 or 15 minutes later and said, "[Giles] wants to know if you're fuckin' with us." Defendant told Warford that he said he would call later and to stop calling him. Warford responded, "look don't raise your voice at me, mother fucker." Defendant hung up the phone. |
| 10-12 | Warford called again 10 to 25 seconds later and said, "look, mother fucker, you don't raise your voice at me. I come over your mother's house and dump on you." Defendant said, "fuck you." Warford responded, "I'll dump on you, your mama and everybody." Defendant again hung up the phone. |
| 13-16 | Defendant testified he expected Warford to come over and possibly shoot him and waited for Warford to arrive. When he saw Warford's car, defendant got one of his father's guns, put it in his back pocket and went outside. Defendant and Warford got into an argument and Warford again threatened to shoot defendant, his mother and everybody else. When defendant saw Warford make an "agitated move as if reaching for a pistol," defendant pulled out his gun and shot. |

Cal. Court of Appeal Opinion, Case No. C033925, filed Aug. 21, 2001 (Op.) at 2-4.[1] The Court of Appeal affirmed petitioner's convictions and sentences. Petitioner sought review of the Court of Appeal's decision in the California Supreme Court, which denied his request without comment. The three claims presented in this action were presented to the California Court of Appeal and California Supreme Court on direct appeal.

II. <u>Standards For Granting Habeas Relief</u>

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws of the

---

[1] The Court of Appeal's opinion and other opinions referenced herein have been lodged with the court.

United States. 28 U.S.C. § 2254(a). Federal habeas corpus relief also is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d) (referenced herein in as "§ 2254(d)" or "AEDPA). See Ramirez v. Castro, 365 F.3d 755, 773-75 (9th Cir. 2004) (Ninth Circuit affirmed lower court's grant of habeas relief under 28 U.S.C. § 2254 after determining that petitioner was in custody in violation of his Eighth Amendment rights and that § 2254(d) does not preclude relief); see also Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003) (Supreme Court found relief precluded under § 2254(d) and therefore did not address the merits of petitioner's Eighth Amendment claim).[2] Courts are not required to address the merits of a particular claim, but may simply deny a habeas application on the ground that relief is precluded by 28 U.S.C. § 2254(d). Lockyer, 538 U.S. at 71 (overruling Van Tran v. Lindsey, 212 F.3d 1143, 1154-55 (9th Cir. 2000) in which the Ninth Circuit required district courts to review state court decisions for error before determining whether relief is precluded by § 2254(d)). It is the habeas petitioner's burden to show he is not precluded from obtaining relief by § 2254(d). See Woodford v. Visciotti, 537 U.S. 19, 25 (2002).

/////

/////

---

[2] In Bell v. Jarvis, 236 F.3d 149, 162 (4th Cir. 2000), the Fourth Circuit Court of Appeals held in a § 2254 action that "any independent opinions we offer on the merits of constitutional claims will have no determinative effect in the case before us . . . At best, it is constitutional dicta." However, to the extent Bell stands for the proposition that a § 2254 petitioner may obtain relief simply by showing that § 2254(d) does not preclude his claim, this court disagrees. Title 28 U.S.C. § 2254(a) still requires that a habeas petitioner show that he is in custody in violation of the Constitution before he or she may obtain habeas relief. See Lockyer, 538 U.S. at 70-71; Ramirez, 365 F.3d at 773-75.

The "contrary to" and "unreasonable application" clauses of § 2254(d)(1) are different. As the Supreme Court has explained:

> A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the "unreasonable application" clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and we stressed in Williams [v. Taylor, 529 U.S. 362 (2000)] that an unreasonable application is different from an incorrect one.

Bell v. Cone, 535 U.S. 685, 694 (2002). A state court does not apply a rule different from the law set forth in Supreme Court cases, or unreasonably apply such law, if the state court simply fails to cite or fails to indicate an awareness of federal law. Early v. Packer, 537 U.S. 3, 8 (2002).

The court will look to the last reasoned state court decision in determining whether the law applied to a particular claim by the state courts was contrary to the law set forth in the cases of the United States Supreme Court or whether an unreasonable application of such law has occurred. Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002), cert. dismissed, 538 U.S. 919 (2003). Where the state court fails to give any reasoning whatsoever in support of the denial of a claim arising under Constitutional or federal law, the Ninth Circuit has held that this court must perform an independent review of the record to ascertain whether the state court decision was objectively unreasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). In other words, the court assumes the state court applied the correct law, and analyzes whether the decision of the state court was based on an objectively unreasonable application of that law.

It is appropriate to look to lower federal court decisions to determine what law has been "clearly established" by the Supreme Court and the reasonableness of a particular application of that law. See Duhaime v. Ducharme, 200 F.3d 597, 598 (9th Cir. 1999).

5

III. Arguments and Analysis

    A. Sufficiency Of Evidence To Support Second Degree Murder

        Petitioner first claims there is not sufficient evidence to support his conviction for second degree murder, because the record, he says, is devoid of evidence to support a finding of malice. Petitioner claims the conviction must be reversed or reduced to voluntary manslaughter. Pet. at Supplemental Page 5A; Mem. P. & A. in Supp. Pet. (Mem.) at 9-21.

        A petitioner for a federal writ of habeas corpus faces a heavy burden when challenging the sufficiency of the evidence used to convict. In Jackson v. Virginia, 443 U.S. 307, 319 (1979), the Supreme Court held "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis in original.)

        The California Court of Appeal addressed petitioner's sufficiency challenge as follows:

> Defendant contends the evidence presented at trial was insufficient to support his second degree murder conviction. He argues the evidence established the killing was committed "under the heat of passion with adequate provocation, and under the actual but unreasonable belief in the necessity to defend himself and his family. . . ."
>
> Murder requires malice. (Pen. Code, § 187.) Malice is negated where the defendant acts (1) on a sudden quarrel or heat of passion, or (2) on an actual but unreasonable belief in the need for self-defense. (*People v. Barton* (1995) 12 Cal.4th 186, 199.)
>
> In arguing that the evidence established the presence of both bases for negating malice, defendant relies on a self-serving interpretation of that evidence. For example, he asserts he had a "heightened sense of security for himself and his family that night" both because of his knowledge of Warford's violent character and "because of the antecedent threats that the victim made toward [defendant] that night." However, defendant cites only his own testimony that threats had been made during the telephone conversations that preceded the killing. There was little other evidence of what was said during those conversations, except what was heard on defendant's end, where defendant repeatedly challenged Warford to come over.

> Defendant further asserts the evidence established Warford "was verbally aggressive toward [defendant] when they encountered each other on the front lawn" and threatened to 'dump on' (i.e. shoot) [defendant], his mother and other family members." According to defendant, "[o]nly after those threats and the victim's hand movements did [defendant] draw his gun and fire at [Warford]." Again defendant relies solely on his own testimony. Although defendant's girlfriend, Brooke B., testified that, just before the shots, she heard Warford say "I'll kill you right now," her testimony was discredited. She admitted lying to police officers when first interviewed and denied seeing defendant with a gun when others testified she was near defendant when he was carrying a gun. Barnett[3] said Warford and defendant were standing together two to three minutes before the shot, whereas Giles testified they were together only five to 10 seconds. Furthermore, Brooke never mentioned the alleged threat to police when first interviewed.
>
> In reviewing the sufficiency of the evidence supporting a conviction, we view the evidence in the light most favorable to the prosecution and determine if a rational trier of fact could have found the elements of the offense beyond a reasonable doubt. (*People v. Davis* (1995) 10 Cal.4th 463, 509.) The evidence presented at trial established defendant had two telephone conversations with Warford that caused him to become agitated. He repeatedly challenged Warford to come over to his house and then obtained a loaded handgun and waited for Warford to arrive. The two spoke to each other for only a few seconds before defendant shot Warford. Warford was unarmed.
>
> The jury was not required to accept defendant's self-serving testimony that he had been threatened by Warford and that Warford made an "agitated move" just before defendant shot. On the totality of the evidence presented, a reasonable jury could have concluded that the prosecution sustained its burden of proving the killing was not attended by a sudden quarrel or heat of passion or by an honest but unreasonable belief in the need for self defense.

Op. at 4-7.

In light of the record in this case, the court finds that petitioner has not met his burden of showing that the California Court of Appeal's adjudication of petitioner's first claim resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States, or resulted in a

---

[3] Barnett is Brooke's last name.

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. As in state court, petitioner asks this court to accept his interpretation of the facts presented at trial. But the Court of Appeal properly analyzed this sufficiency of the evidence claim considering the facts in the light most favorable to the prosecution. This court's own review of the record discloses the evidence included Brooke Barnett's describing petitioner's having "slammed down" the phone after Warford's second call. RT 647:17-648:18. To the extent Barnett provided some testimony that could have helped petitioner, including that she never saw him with a gun, RT 652:27-653:24, Barnett's impeachment with her statement provided shortly after the shooting raised questions about her credibility; in her statement, she had described petitioner as "angry" and as having used a racial epithet directed to the victim on the phone. RT 725:23-728:25; see also RT 955:15-956:19 (Sheriff's Detective Bell testifying that Barnett provided a statement describing petitioner as "angry," "furious," and as having "slammed" the phone down). Barnett also demonstrated the way in which petitioner held the gun at the time of shooting, RT 733:6-735:8, and at one point indicated that defendant sounded "mad" that Warford was coming to the house. RT 738:17-739:27. Petitioner's father testified that one of his guns had been missing since the time of the shooting. RT 768:18-769:23. Petitioner's sister said she saw petitioner with a gun, which he stowed in his back pocket after "cussing" during a phone call during which he challenged the caller to "come over," using a racial epithet. RT 795:24-803:11; see also RT 902:13-903:21 (Detective Bell's testimony that sister described petitioner on night of shooting as having said "I'm ready for him."). Chris Giles, the passenger in Warford's car, essentially admitted to describing petitioner on the night of the shooting as "creeping" toward the car. RT 864:20-865:24, 870:8-884:12. Giles did not hear any arguing or petitioner making any threat before the shooting. RT 891:13-19.

    The state court's conclusion -- that when considered in the light most favorable to the prosecution, the facts are sufficient to support the jury's finding that petitioner acted with

1  malice when he killed Shawn Warford -- is fully supported by the record.

2      B. <u>Sufficiency Of The Evidence To Support Assault With A Deadly Weapon</u>

3      Petitioner also claims the evidence presented at trial was insufficient to convict him of assault with a deadly weapon.  Pet. at Supplemental Page 5A; Mem. at 21-31.  The Court of Appeal addressed this claim as follows:

> Defendant's conviction for assault with a firearm is based on his actions toward Chris Giles after shooting Warford.  Defendant contends this conviction must be reversed because the evidence is insufficient to establish he committed an assault with the requisite mental state.  Again, however, defendant relies on a view of the evidence in the light most favorable to himself rather than the judgment.
>
> "An assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on the person of another." (Pen. Code, § 240.)  Assault is a general intent crime. *(People v. Colantuono* (1994) 7 Cal.4th 206, 214-215, 218.)  It requires proof of a "willful act that by its nature will directly and immediately cause []the least touching . . . .[]" (*Id.* at p. 218.)  "Holding up a fist in a menacing manner, drawing a sword, or bayonet presenting a gun at a person who is within its range, have been held to constitute an assault." (*People v. McMakin* (1857) 8 Cal. 547, 548.)  Assault with a firearm does not require that the defendant actually fire the weapon at the victim.  Pointing the firearm at the victim with a present intent and ability to use it will suffice. (See *People v. Escobar* (1992) 11 Cal.App.4th 502, 505; *People v. Duncan* (1945) 72 Cal.App.2d 423, 427.)
>
> Defendant contends he "did not commit the required physical act of assault because he did not point the gun at Giles while threatening to shoot him." In *People v. Diamond* (1939) 33 Cal.App.2d 518, the court reversed a conviction for assault with a deadly weapon because there was no evidence the defendant pointed the firearm at the victim.
>
> Although Giles testified at trial that defendant did not point the gun at him or threaten him but merely waived [sic] the gun around while telling him to get Warford away, Giles acknowledged he told police on the night of the incident that defendant had pointed the gun at him.  Giles explained he was exaggerating to the police in order to shift any blame from himself to defendant.  Giles also acknowledged he told the officers that defendant told him "to get up out of here before I blast you, too."  Notwithstanding Giles's equivocal testimony at trial, his extrajudicial statements constitute substantial evidence that defendant pointed the gun at Giles while threatening to shoot if Giles did not leave.  (See Evid. Code,

1  § 1235.) The jury was free to ignore Giles's attempted retraction at trial.

Op. at 7-8.

Here as well, petitioner has not met his burden of showing that the California Court of Appeal's decision resulted in a decision that was contrary to established federal law, or resulted in a decision based on an unreasonable determination of the facts. There was sufficient evidence presented in the state court proceeding such that a rational trier of fact could have found, beyond a reasonable doubt, that Giles's account to police officers shortly after the shooting, that petitioner pointed a gun at him and threatened to kill him, RT 942:4-13, 946:13-15, was believable generally. The trier of fact also could have found Giles's "fresh" account more believable than his less dramatic description of his encounter with petitioner as first provided at trial. RT 888:25-889:8, 891:2-5, 893:7-15, 894:1-8, 894:27-896:3. To the extent petitioner's jury made a credibility determination in deciding which version of Giles's story to believe, this court must defer to that determination. Jackson, 443 U.S. at 326.

Petitioner also argues that the Court of Appeal erred in relying upon California Evidence Code § 1235 in considering extrajudicial statements made by Chris Giles. Mem. at 23:27-24:19. It appears that the extrajudicial statements made by Giles were admissible. California Evidence Code § 1235 provides: "Evidence of a statement made by a witness is not inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code § 770 reads:

> Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless:
>
> (a) The witness was so examined while testifying as to give him an opportunity to explain or deny the statement; or
>
> (b) The witness has not been excused from giving further testimony in the action.

Chris Giles was on the stand while the prosecution played tape-recorded excerpts of his

extrajudicial statements. RT 943:8-948:6. As noted by the Court of Appeal, Giles's pretrial statements indicated petitioner pointed a gun at Giles and told Giles that if he did not leave the area around his home petitioner would "blast" Giles. RT 942:9-13, 946:13-16. These statements were at least partially inconsistent with Giles's more equivocal trial testimony indicating that Giles and petitioner "had words," RT 888:25-28, and that petitioner walked down the driveway and waved a gun at Giles. RT 894:1-3. Also, Giles specifically indicated at one point during trial that petitioner did not point the gun at him or threaten to kill him. RT 895:1-7.

Petitioner asserts the Court of Appeal never saw a transcript of Giles's "extrajudicial statements,"[4] or listened to the tape upon which they were recorded.[5] Mem. at 25:1-27:26. However, petitioner does not dispute what was actually on the tape, and he did not raise this issue before the Court of Appeal. In any case, Giles admitted in his testimony to telling police officers before trial that petitioner pointed a gun at Giles and told Giles that if he did not leave the area around petitioner's home petitioner would "blast" Giles. RT 942:9-13, 946:13-16. The Court of Appeal's conclusion, then, and petitioner's assault conviction, is supported by sufficient evidence in the record.

Petitioner's second claim should be rejected.

/////

---

[4] In a document filed by petitioner on March 1, 2006, petitioner submits a motion made by his trial counsel to the Superior Court of Sacramento County in which counsel asks that the record on appeal be augmented with, among other things, exhibit 13. In the motion, trial counsel asserts exhibit 13 is the transcript containing the extrajudicial statements made by Chris Giles at issue. March 1, 2006 "Motion In Opposition . . .," Ex. A ¶ 3. Exhibit 13 is actually an un-sanitized copy of the actual tape recording containing the statements. RT 1616:3-1617:10. Moreover, the clerk did not submit exhibit 13 to the Court of Appeal because exhibit 13 was not admitted into evidence at trial. See "Declaration of Sacramento County Clerk that exhibits 12, 13, and 14 were not admitted into evidence," lodged on June 16, 2004.

[5] In response to the court's January 25, 2006 order, respondent confirms that the Court of Appeal never reviewed the tape including recordings of the extrajudicial statements made by Christopher Giles, which was identified as Exhibit 13A at trial. See Docket Entry #26. Respondent also indicates that the tape has been destroyed. Id. In light of this information provided by respondent, the order to show cause issued December 30, 2005, will be discharged.

C. Jury Instructions

Petitioner's final claim is that the trial court violated his right to a fair trial arising under the Due Process Clause of the Fourteenth Amendment, by failing to provide jurors with certain instructions. Pet. at Supplemental Page 5B; Mem. at 31-51. Claims of error in state jury instructions are generally a matter of state law and do not invoke a constitutional question unless they amount to a deprivation of due process. Hayes v. Woodford, 301 F.3d 1054, 1086 (9th Cir. 2002). A violation of due process occurs if a trial is fundamentally unfair. Estelle v. McGuire, 502 U.S. 62, 72-73 (1991). Because the omission of an instruction is less likely to be prejudicial than a misstatement of the law, a habeas petitioner whose claim involves a failure to give a particular instruction bears an especially heavy burden. Henderson v. Kibbe, 431 U.S. 145, 155 (1977). Where the given instructions adequately embody the defense theory, the defendant may not obtain habeas relief merely because the jury instructions did not contain the precise language he prefers. See United States v. Del Muro, 87 F.3d 1078, 1081 (9th Cir. 1996).

The California Court of Appeal addressed petitioner's claim of jury instruction error as follows:

> Defendant contends the trial court erred in refusing his special instructions on antecedent threats and the victim's reputation for violence. Those instructions would have informed the jury that one who received such threats or had knowledge of such reputation is justified in acting more quickly and taking harsher measures in the event of an actual or threatened assault.[Fn1] The trial court crafted its own instruction which read: "A person who has knowledge of another's character for violence is justified in having a higher degree of apprehension of danger from such an individual and may take harsher measures for his own protection in the event of an actual or threatened assault than a person who has no knowledge of such character."
>
> Defendant contends the trial court's instruction "misleadingly merged" the concepts of antecedent threats and reputation for violence. According to the defendant, the instruction given was inadequate both because it failed to mention he was justified in acting more quickly and because the jury was not informed it should consider the victim's reputation for violence as well as antecedent threats.

The People argue defendant was not entitled even to the instruction given by the court because a person is not justified, as a matter of law, in acting more quickly and harshly by virtue of the victim's antecedent threats or reputation for violence. According to the People, defendant was entitled only to an instruction explaining that *all* evidence should be considered in deciding whether he perceived an imminent threat.

The trial court has a duty to instruct on the general principles of law relevant to the issues raised by the evidence. (*People v. Kimble* (1988) 44 Cal.3d 480, 503.) The court in fact has a sua sponte duty to instruct on a particular defense "if it appears that the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." (*People v. Sedeno* (1974) 10 Cal.3d 703, 716, overruled on other grounds in *People v. Flannel* (1979) 25 Cal.3d 668, 684, fn. 12.) In addition, a defendant is entitled upon request to a "pinpoint" instruction that relates particular facts to a legal issue in the case. (*People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885; *People v. Wharton* (1991) 53 Cal.3d 522, 570.) "What is pinpointed is not specific evidence as such, but the *theory* of the defendant's case." (*People v. Adrian* (1982) 135 Cal.App.3d 335, 338, original italics.)

The jury here was instructed on both self-defense and imperfect self-defense. However, defendant was also entitled to an instruction that related the victim's reputation and antecedent threats to those defenses and explained that such matters may be taken into consideration in determining whether defendant acted as a reasonable person under the circumstances. (See *People v. Moore* (1954) 43 Cal.2d 517, 527-529; *People v. Gonzales* (1992) 8 Cal.App.4th 1658, 1663-1664.)

Contrary to defendant's assertion and the People's implicit concession, a careful reading of the record reveals the court in fact gave a second instruction which related the fact of antecedent threats to defendant's actions. It read: "One who has received threats against his life or person made by another is justified in acting more quickly and taking harsher measures for his own protection in the event of assault either, actual or threatened, than would be a person who has not received such threats."[Fn2]

Defendant was entitled to nothing further. Although the instruction on reputation failed to mention that defendant would be justified in acting more quickly, it nevertheless adequately alerted the jury to the fact the victim's reputation for violence should be taken into consideration in deciding whether defendant perceived an imminent threat at the time of the shooting.

[Fn1] Defendant requested the following instructions:

"One who has received threats against [his] [her] life or person made by another is justified in acting more quickly and taking harsher measures for [his] [her] own protection in the event of assault either actual or threatened, than would a person who had not received such threats. [¶] If in this case you believe that _____ _____ [insert name of deceased or assault victim] made prior threats against the defendant and that the defendant, because of such threats, had reasonable cause to fear greater peril in the event of an altercation with _____ [insert name of deceased or assault victim], you are to consider such facts in determining whether the defendant acted as a reasonable person in protecting [his] [her] own life or bodily safety."

"A person who has knowledge of another's general reputation for violence, even if he is not aware of the specific acts of violence upon which the reputation is based, is justified in having a higher degree of apprehension of danger from such an individual and may take harsher measures for his own protection in the event of an actual or threatened assault than a person who has no knowledge of such a reputation. [¶] If you believe from the evidence that the complaining witness had a general reputation for violence and because the defendant had knowledge of this reputation [he] [she] had reasonable cause to fear greater peril in the event of an altercation with the complaining witness than [he] [she] would have otherwise, you must take such knowledge into consideration in determining whether the defendant acted in a manner in which a reasonable person would act in protecting [his] [her] own life or bodily safety."

[Fn2] This instruction was included in the court's discussion of self-defense. [RT 1475:19-26.] For whatever reason, a written version of it is not included in the clerk's transcript and, presumably, was not provided to the jury during deliberations.

Op. at 8-12.

Here as well, petitioner has not met his burden of establishing that the California Supreme Court's rejection of his claim concerning jury instruction error reflects an objectively unreasonable application of clearly established federal law as determined by the Supreme Court.[6]

---

[6] It does not appear that any California Court issued a reasoned decision with respect to petitioner's denial of due process claim concerning jury instruction error. Therefore, under Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003), the court assumes the California Supreme Court applied the correct law, and analyzes whether the decision of the court rejecting petitioner's due process claim reflects an objectively unreasonable application of that law.

1  Petitioner's jury was instructed that it could find petitioner's killing Shawn Warford constituted

2  self-defense. Jurors were instructed that the elements of self defense are as follows:

> The killing of another person in self-defense is justifiable and not unlawful when the person who does the killing actually and reasonably believes:
>
> 1. That there is imminent danger that the other person will either kill him or cause him great bodily injury; and
>
> 2. That it is necessary under the circumstances for him to use in self-defense force or means that might cause the death of the other person, for the purpose of avoiding death or great bodily injury to himself. . .

CT 495. Jurors were not instructed that they could not consider any possible threats made by Shawn Warford, or Warford's reputation for violence, in determining whether petitioner reasonably believed there was an imminent danger that Warford would either kill him or cause him great bodily injury. They were not instructed not to consider whether petitioner reasonably believed that it was necessary for petitioner to use, in self-defense, force or means that might cause the death of Warford for the purpose of avoiding death or great bodily injury to himself. Petitioner was allowed to present his theory of self-defense during his case. See RT 1004-1325. Four separate third party witnesses testified regarding Warford's reputation for violence and specific incidents of his pulling a gun on someone and threatening them. RT 1002:1-1005:20, 1027:3-1033:11, 1047:3-1052:20, 1060:24-1066:27. Petitioner himself testified to the same effect. RT 1226: 21-1238:16, 1284:13-1285:2. In light of the instruction set forth above, jurors were free to consider this testimony in determining whether petitioner acted in self-defense.

Given this record, the court cannot find that petitioner was denied the opportunity to present his theory of the case to jurors, that petitioner's trial was fundamentally unfair, or that petitioner was denied due process.

IV. Conclusion

For all of the foregoing reasons, the court will recommend that petitioner's application for writ of habeas corpus be denied.

1  In accordance with the above, IT IS HEREBY ORDERED that the order to show
2  cause issued December 30, 2005 is discharged; and
3  IT IS HEREBY RECOMMENDED that petitioner's application for a writ of
4  habeas corpus be denied.
5  These findings and recommendations are submitted to the United States District
6  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fifteen
7  days after being served with these findings and recommendations, any party may file written
8  objections with the court and serve a copy on all parties.  Such a document should be captioned
9  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections
10 shall be served and filed within five days after service of the objections.  The parties are advised
11 that failure to file objections within the specified time may waive the right to appeal the District
12 Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).
13 DATED:  March 16, 2006.

_____
UNITED STATES MAGISTRATE JUDGE

1/hanc2413.157